IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

LEE JAMES BARLEY, II,                                    Case No. 3:22-cv-01921-JR

      Plaintiff,                                              OPINION AND ORDER

        v.

ARCBEST II, INC., dba U-PACK;
OLD DOMINION FREIGHT LINE, INC.,

      Defendants.

Russo, Magistrate Judge:

Defendants ArcBest II, Inc. ("ArcBest") and Old Dominion Freight Line, Inc. ("Old Dominion") move to exclude the expert opinions of Mark Repass, Jeffrey Marksthaler, and Michael Freeman, and move for summary judgment on plaintiff Lee James Barley's claims pursuant to Fed. R. Civ. P. 56. For the reasons stated below, defendants' motions to exclude are granted and defendants' motions for summary judgment are granted in part and denied in part.

Page 1 – OPINION AND ORDER

**BACKGROUND**

This dispute arises from an incident that occurred on February 6, 2021, in which plaintiff was injured when he fell while loading his belongings into a trailer.

In January 2021 plaintiff planned a move from Oregon to Kentucky and conducted an internet search to hire a company to assist with the move. Plaintiff solicited bids from "pretty much everything that came up in a web search," including companies like ArcBest (dba U-Pack) with which individuals "loaded up [their] stuff, and the [company] just transported it." First Oh-Keith Decl. Ex. 1, at 82-83 (doc. 45). Plaintiff initiated contact with ArcBest online and spoke on the telephone with an ArcBest employee in Arkansas. First Barton Decl. Ex. 3, at 31-32 (doc. 41). ArcBest is a freight forwarder, which uses transportation providers to perform the moving service. *Id.* at 14. In this case, ArcBest contacted Old Dominion to be the transportation provider for the trailer ordered by plaintiff. *Id.* at 31. Old Dominion delivered a 28-foot trailer to plaintiff on January 25, 2021. The trailer had a roll-up door equipped with a nylon strap to enable users to pull the door open and closed.

From January 25, 2021, through February 6, 2021, plaintiff and family members loaded belongings into the trailer. On February 6, 2021, while standing on the trailer's rear deck, plaintiff pulled down on the strap to close the trailer door. Plaintiff alleges that as he pulled the strap, it "just busted" causing plaintiff to fall backwards, strike the ramp, hit the driveway, and suffer serious injuries. First Oh-Keith Decl. Ex. 1 at 22-23 (doc. 45).

On November 14, 2022, plaintiff filed a complaint in Multnomah County Circuit Court against defendants asserting claims for negligence and strict products liability. Defendants removed the matter to this Court on December 12, 2022.

Defendants move to exclude the opinions of three of plaintiff's experts and move for summary judgment on each of plaintiff's claims.

## DEFENDANTS' MOTIONS TO EXCLUDE

Defendants move to exclude the expert opinions of Mark Repass, Jeffrey Marksthaler, and Michael Freeman pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

## I.    Standards

"A court may admit expert testimony when the testimony is helpful, based on 'sufficient facts or data,' and produced by 'reliable principles and methods,' reliably applied to the facts of the case." *United States v. Jimenez-Chaidez*, 96 F.4th 1257, 1269 (9th Cir. 2024) (quoting Fed. R. Evid. 702(b)). "Federal Rule of Evidence 702 imposes a special obligation upon a trial judge to 'ensure that any and all scientific testimony . . . is not only relevant, but reliable.'" *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999) (quoting *Daubert*, 509 U.S., at 589). "[T]his basic gatekeeping obligation" applies "to all expert testimony." *Id.* "The objective . . . is to ensure the reliability and relevancy of expert testimony . . . [and] the trial judge [has] considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Id.* at 152.

"Rule 702's 'sufficient facts or data' element requires foundation, not corroboration." *Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1026 (9th Cir. 2022). It is not the court's role "to determine whether an expert's hypothesis is correct, or to evaluate whether it is corroborated by other evidence on the record." *Id.* (citing *Daubert*, 509 U.S. at 594-95 (1993)). "Rule 702 does not license a court to engage in freeform factfinding, to select between competing versions of the

Page 3 – OPINION AND ORDER

evidence, or to determine the veracity of the expert's conclusions at the admissibility stage." *Elosu,* 26 F.4th at 1027 (citation and quotation marks omitted).

"Expert testimony should be excluded . . . when a court 'conclude[s] that there is simply too great an analytical gap between the data and the opinion proffered.'" *Thomsen v. NaphCare, Inc.,* No. 3:19-CV-00969-AR, 2023 WL 8701971, at *2 (D. Or. Dec. 15, 2023), objections overruled, No. 3:19-CV-00969-MO, 2024 WL 551426 (D. Or. Feb. 12, 2024) (quoting *Elosu,* 26 F.4th at 1026). "Courts properly exclude expert opinions that are 'based on assumptions which are speculative and are not supported by the record.'" *Id.* (quoting *Morrison v. Quest Diagnostics Inc.,* 2:14-cv-01207-RFB-PAL, 2016 WL 3457725 (D. Nev. June 23, 2016)).

The trial court also has the same "considerable leeway" when "deciding *how* to test an expert's reliability, and to decide whether or when special briefing or other proceedings are needed to investigate reliability, as it enjoys when it decides *whether or not* that expert's relevant testimony is reliable." *Kumho,* 526 U.S. at 152 (emphasis in original).

In 2023 Rule 702 was amended to require "a proponent of expert testimony to demonstrate each of the requirements of Rule 702 by a preponderance of the evidence." *Engilis v. Monsanto Co.,* 151 F.4th 1040, 1050 (9th Cir. 2025). "The Amendment sought to address the 'incorrect application of Rule[ ] 702,' in which courts 'held that the critical questions of the sufficiency of an expert's basis, and the application of the expert's methodology, [were] questions of weight and not admissibility.'" *Cadena v. Am. Honda Motor Co.,* No. CV 18-04007-MWF (MAAX), 2025 WL 3483436, at *2 (C.D. Cal. Dec. 3, 2025) (quoting Fed. R. Evid. 702, Advisory Committee Note to 2023 Amendment).

Page 4 – OPINION AND ORDER

**II.    Motion to Exclude Expert Opinions of Mark Respass**

Defendants move to exclude the opinions of Mark Respass on the grounds that he lacks the requisite qualifications, expertise, or experience to render expert opinions regarding Old Dominion's scheduled inspections and maintenance of the trailer door and strap or the applicable Federal Motor Carrier Safety Regulations ("FMCRs") regarding annual inspections and maintenance. Defendants also assert Respass's opinions lack a basis in mechanical methodology and fail to meet the standards for admissibility under Rule 702.

On September 6, 2024, Respass prepared an expert report for plaintiff. Respass reviewed the Complaint, photographs of the trailer and "scene," the deposition testimony and exhibits of various witnesses, supplemental discovery responses, trailer maintenance records, and the Transglobal Door maintenance manual. Third Barton Decl. Ex. 1, at 2 (doc. 50). Respass made several findings including that the strap at issue was "badly worn and weakened" when the trailer was delivered to plaintiff, the Old Dominion driver who delivered the trailer failed to notice that the strap was badly worn and weakened, Old Dominion fell below a reasonable standard of care for a motor carrier by not maintaining the roll-up door's mechanical components and the pull strap, and Old Dominion was out of compliance with 49 C.F.R. § 396.17, which "was a contributing factor to the subject pull-strap failure." *Id*. at 15.

Defendants point out that the Old Dominion driver who delivered the truck, Brad Ball, testified that before he delivered a trailer he would inspect it, including the door and the "straps on the door," and if there was an issue he would either "take it to the shop or get a new trailer." First Barton Decl. Ex. 5 at 33, 38 (doc. 41). Ball stated that a strap would not pass his inspection if it had tears over half an inch. *Id*. at 38-39. Ball also noted that no report was filled out if a trailer passed inspection; although he did not specifically remember inspecting the strap at issue, he did

a pre-trip inspection that would have included looking at the strap and the door; and there was no report of any issues with the trailer. *Id*. at 39-40. In addition, plaintiff testified at deposition that he did not have any problems with the strap between January 25 and February 6, 2021; he did not "notice anything unusual about the strap"; he did not see any "fraying or tearing or anything else on the strap"; and he "never noticed anything obvious[ly] wrong with the strap." First Barton Decl. Ex. 1 at 168-69 (doc. 41). Plaintiff also testified that in the 12 days between receipt of the trailer and the accident he did not call defendant to complain about the condition of the trailer or to complain about the strap or the trailer door. *Id.* at 159, 166.

When asked, Respass testified that he found no evidence that Ball did not do a pre-trip inspection. Third Barton Decl. Ex. 2 at 78 (doc. 50). Respass conceded that he does not have "expertise in pull straps" or in "determining what causes them to fail" or any expertise "in what fibers or materials were involved in this particular strap." *Id.* at 112. Respass stated that he based his finding that the strap was "badly worn and weakened" when the trailer was delivered to plaintiff on "common sense, that this is an old strap." *Id.* at 107-08. When asked to "put aside . . . common sense" and to provide what "expertise [he] ha[s] in determining why this particular strap failed," Respass stated he "would not have any scientific expertise as to why it failed." *Id*. Respass also conceded he was "not qualified to give any opinions about the webbing material [of the strap] and . . . how long it should last," to "give an opinion about whether these straps require replacement in eight to ten years," or to "opine about shock loading." *Id*. at 113-14.

Respass agreed that Old Dominion's internal maintenance schedule goal of quarterly inspections exceeds the annual inspection requirements under FMCSR and the industry standard, therefore Old Dominion's failure to have inspected the trailer within its internal schedule did not

Page 6 – OPINION AND ORDER

violate FMCSR. *Id.* at 71. Respass also agreed that every time Old Dominion identified an issue with the subject trailer, Old Dominion repaired it. *Id.* at 94-95.

Defendants assert plaintiff has not established that Respass is qualified to offer opinions regarding maintenance or mechanical issues in this case because he has never conducted maintenance or performed or observed an annual inspection of any commercial vehicle or trailer. Third Barton Decl. Ex. 2 at 28-30, 37-38, 41, 45-46, 47-48 (doc. 50). Respass testified that he based his qualification to testify as to the maintenance and repair of the subject trailer on his time as a commercial truck driver from the late 1970s to 1987 and on his many years of experience in various safety manager and director of safety positions. Respass also had a "certified director of safety certification which . . . expired that involved a week of training in all aspects of fleet motor carrier safety, which included maintenance." *Id.* at 28. Respass testified, however, that he has never "been directly involved in the maintenance of trailer doors" or in the repair of trailer doors in any of those positions. *Id.* at 90, 92. In his safety director positions he oversaw driver's logbooks, reviewed hours of service and driver qualifications, and worked with directors of maintenance, but he has no first-hand knowledge, experience or expertise with respect to commercial trailer inspections or maintenance. *Id.* at 41-42, 45-46, 47-49, 51.

The Court concludes on this record that plaintiff has not established by a preponderance of the evidence that Respass's opinions are based on adequate facts or data or on a reliable methodology. Plaintiff also has not established that Respass is qualified as an expert by his "knowledge, skills, experience, training, or education" or that his technical or other specialized knowledge will help the trier of fact. Accordingly, the Court grants defendants' Motion to Exclude Expert Opinions of Mark Respass.

**III.     Motion to Exclude Expert Opinions of Jeffrey Marksthaler**

Defendants move to exclude the opinions of Jeffrey Marksthaler on the grounds that he lacks the requisite education, training, experience, and expertise to qualify as an expert in the testing and analysis of the subject door strap or the operation, maintenance, repair, or inspection of commercial trailer doors. Defendants also assert Marksthaler failed to apply reliable scientific principles and methodology to his analysis and instead relied on speculation and "intuition." Finally, defendants assert Marksthaler's rebuttal report does not rebut the opinions expressed by defendants' experts in their reports and instead offers new hypotheses and conclusions and contradicts his deposition testimony.[1]

On September 9, 2024, Marksthaler prepared an expert report for plaintiff for which he inspected and photographed the segment of the strap at issue, inspected the strap "under magnification," inspected the trailer, reviewed overhead roll-up door installation and maintenance documentation, attended various laboratory examinations and tests of the strap, reviewed deposition transcripts and exhibits of various witnesses, reviewed trailer maintenance records, and reviewed photographs and data from the examinations of the strap. Marksthaler concluded the trailer door "was not operating correctly for a long period of time before . . . February 6, 2021"; Old Dominion did not routinely inspect the trailer door; rollers were not correctly installed in the trailer door; the strap "was old, embedded with road grime, and had multiple old cuts and tears"; "[t]he fractured area was located where the pull strap contacted the edge of the bumper and exhibited exceptionally severe fatigue-like fracture from repeated overloading, more likely than

---

[1] Defendants object to the fact that plaintiff's Response exceeds the word and page limit permitted under Local Rule 7-2. Because the length of plaintiff's Response does not materially effect the Court's analysis, the Court declines defendants' invitation to sanction plaintiff for the violation of Rule 7-2.

Page 8 – OPINION AND ORDER

not directly related to years of overloading during closing an improperly operating door"; and the "last overload event was [plaintiff] pulling down with a large enough load to rip the last remaining fibers, resulting in [plaintiff's] fall." Second Marksthaler Decl. Ex. 2 at 13 (doc. 59).

On December 12, 2024, Marksthaler prepared a rebuttal expert report in which he noted he had reviewed the defendants' experts reports and he was providing a rebuttal to those reports. Marksthaler concluded, among other things, that "the required spacer washers were not installed" on the trailer door "leading to binding of the door while it was being closed"; the strap was "discolored, weathered, frayed, and torn for many months before its ultimate failure"; the "strap started tearing and got progressively worse by shock loading over the 3 plus years that the door was binding as it was being closed"; and "[i]mmediately before failure, only a small section of the strap width remained, and it tore . . . when the final shock load exceeded its strength." *Id*., Ex. 3 at 1-2.

### A.    Marksthaler's Initial Expert Report

Defendants move to exclude the opinions of Jeffrey Marksthaler contained in his initial expert report on the grounds that he lacks the requisite education, training, experience, and expertise to qualify as an expert in the testing and analysis of the door strap or operation, maintenance, repair, or inspection of commercial trailer doors, and he failed to apply reliable scientific principles and methodology to his analysis and instead relied on speculation and intuition.

At deposition Marksthaler testified that he is a metallurgical engineer and his only education on woven materials involved a "very small amount" of a one-semester general materials undergraduate course. Fourth Barton Decl. Ex. 1 at 28 (doc. 51). Marksthaler's experience with polymers was limited to a one-day axial tension testing and verbal assessment of an unknown type

 Page 9 – OPINION AND ORDER

of polymer webbing with one employer and visual inspections of "webbing slings" that did not include testing to analyze the tensile strength with a second employer. Third Oh-Keith Decl. Ex. 4 at 43-44, 47 (doc. 58). Marksthaler testified that he has had no experience in "what might cause fraying polyester or similar fibers, or materials, such as a strap." Fourth Barton Decl. Ex. 1 at 121 (doc 51). Marksthaler noted that prior to this case he had never analyzed the operation of a commercial trailer door and he had no "expertise in the subject." *Id*. at 163. Marksthaler's prior expert experience involved a glass coffee-making carafe and a failed water toilet supply line. *Id*. at 9, 53. Defendants assert that this is insufficient to establish that Marksthaler had the education, training, experience, and expertise to qualify as an expert in the strap or trailer door.

Defendants also assert Marksthaler should not be qualified as an expert because he failed to apply reliable scientific principles and methodology to his analysis of the door and strap. Marksthaler inspected the trailer door at issue at Old Dominion on April 9, 2024. Marksthaler stated in his report that at that time the "rollers and axels were observed to be rusty and the tracks showed several areas of mechanical damage." Fourth Barton Decl. Ex. 2 at 10 (doc. 51). Marksthaler conceded at deposition, however, that his inspection occurred more than three years after the incident, during which time the trailer had been sitting outside and had not been maintained or serviced. Fourth Barton Decl. Ex 1 at 238, 255 (doc. 51). Marksthaler did not know whether the damage that he observed to the tracks and rollers "happened . . . immediately before, during, or after [plaintiff's] operation of the door." *Id*. at 259. Marksthaler stated in his report that "attempts at raising and lowering the door were not smooth and uniform. They were characterized as significantly 'binding' at certain locations." *Id*. Ex. 2 at 10. At deposition, however, Marksthaler stated that he did not know "if that's the same condition [of the door] three years earlier when [plaintiff] was dealing with the door." *Id*. Ex 1 at 242.

Page 10 – OPINION AND ORDER

Marksthaler opined that the installation and maintenance document of door manufacturer, Transglobal Door, stated that "spacer washers were required to be installed at the second-from-the-top and second-from-the-bottom rollers," but "these spacer washers were not observed on the subject" door during the April 2024 inspection. Fourth Barton Decl., Ex. 2 at 10 (doc. 51). The documents on which Marksthaler relied for that opinion, however, were related to trailer doors manufactured in 2017 and the trailer at issue here was manufactured in 2013. Second Marksthaler Decl. Ex. 2 at 4 n.2, 6; Ex. 3 at 15 (doc 59). In his expert report there is no evidence that the recommendations for 2017 trailers apply to the 2013 trailer at issue.

Marksthaler stated in his report that at times 120 pounds of force was needed to pull the subject trailer door down "at roughly 1/3 of its travel." *Id*. at Ex. 2 at 10. When asked at deposition how that amount of force was calculated, Marksthaler explained that he did not conduct force testing on the door at issue. Marksthaler attempted "to determine speeds that are reasonable" and the force used by observing a technician at his laboratory pulling down an overhead roll-up door. Fourth Barton Decl. Ex. 1 at 82, 85 (doc. 51). The door Marksthaler used in testing, however, was not the same as the door on the trailer. *Id.* at 85. Marksthaler stated the door was of a "roughly similar dimension," although the did not actually measure it because he knew the door he was testing "was much larger" in "width and height" than the trailer door. *Id*. When conducting testing "there was a rope attached" to the tester door that was not the same material as the strap at issue, nor was it "of any similar length to the strap that was involved" in the incident. *Id*. at 86. The rope was made of "natural fiber" and was "tied with a knot" to the door. *Id.* at 88. Marksthaler also did not determine whether the technician who was involved in the testing was of a similar height, weight, or age to plaintiff. *Id.* at 86-87.

Page 11 – OPINION AND ORDER

As noted, Marksthaler opined that the strap was "old, embedded with road grime, and had multiple old cuts and tears." Fourth Barton Decl., Ex. 2 at 13 (doc. 51). At deposition Marksthaler conceded that he had no way "of knowing when those [cuts and tears] might have occurred except that they were present when [he] examined [the strap] in August 2021," six months after the incident. *Id.*, Ex. 1 at 109. Marksthaler noted he had seen photographs showing that the strap was lying on the ground after the incident and he did not "know what grime might have been on the fabric and ends of the fabric prior to . . . receiving the strap in August 2021." *Id.* at 173. Marksthaler admitted he "had no experience in what might cause fraying polyester or similar fibers or materials, such as a strap." *Id.* at 121. Marksthaler stated that it was "intuitive" that "exposure to the environment and use . . . led to the[] individual fibers" in the subject strap recoiling back, bending down back upon themselves over the extended period of time" and "[t]here is no science" to support that statement. *Id.* at 140. When asked for the source of Marksthaler's information and opinion that fibers fray more easily when they are dirty, he responded that it was a video on YouTube regarding climbing rope rather than a scientific article or similar. *Id.* at 213.

## B.    Marksthaler's Rebuttal Report

In his rebuttal report Marksthaler opines that "[i]mmediately before failure, only a small section of the strap width remained." Second Marksthaler Decl. Ex. 3 at 2 (doc 59). At deposition, however, Marksthaler conceded that "he would have to think of a way" to scientifically determine when various sections of the strap failed. Fourth Barton Decl. Ex. 1 at 166 (doc. 51).

Marksthaler also opines that the "strap started tearing and got progressively worse by shock loading over the 3 plus years that the door was binding as it was being closed." Second Marksthaler Decl. Ex. 3 at 2 (doc. 59). Marksthaler explains that [f]ollow-up lab work . . . improved the understanding of the degree of shock loading [that] the . . . strap experienced at each closing of the

mis-installed Door [*sic*]." *Id*. Defendants point out that none of the defense experts discussed or made any mention of shock loading in the reports. Marksthaler agreed at deposition that the idea of shock loading "occurred to [him]" before his first expert report, but he did not make any mention of shock loading in his initial report. Barton Reply Decl. Ex 3, at 155-56 (doc. 66). Marksthaler also agreed that none of the defense experts mentioned or discussed shock loading. *Id*. at 156.

Federal Rule of Civil Procedure 26(a)(2)(D)(ii) provides that an expert may submit a rebuttal report "if the evidence is intended solely to contradict or rebut evidence on the same subject matter identified by another party under Rule 26(a)(2)(B) or (C)." "'The proper function of rebuttal evidence is to contradict, impeach or defuse the impact of the evidence offered by an adverse party.'" *Synergy Hematology-Oncology Med. Assocs. Inc. v. Abbott Labs., Inc*., No. 2:22-CV-01560-SPG-JEM, 2023 WL 3319218, at *7 (C.D. Cal. Mar. 15, 2023) (quoting *Matthew Enter., Inc. v. Chrysler Grp. LLC*, No. 13-CV-04236-BLF, 2016 WL 4272430, at *1 (N.D. Cal. Aug. 15, 2016)). "[A] rebuttal report is not the time to change methodologies to account for noted deficiencies; instead, it is to respond to criticisms of such methodologies." *Id.* (quotation omitted). In addition, "[u]sing a rebuttal report as a backdoor to introduce analysis that could have been included in the opening report is squarely foreclosed by Rule 26." *City & Cnty. of S.F. v. Purdue Pharma L.P.*, No. 18-CV-07591-CRB, 2022 WL 1203075, at *2 (N.D. Cal. Apr. 22, 2022); *Century Indem. Co. v. Marine Grp., LLC*, No. 3:08-CV-1375-AC, 2015 WL 5521986, at *3 (D. Or. Sept. 16, 2015) (Rebuttal testimony "is limited to new unforeseen facts brought out in the other side's case"). Marksthaler concedes he had the information to opine about shock loading before he produced his first report and the record reflects that defendants' experts did not mention or discuss shock loading. Accordingly, the Court concludes that Marksthaler's opinion regarding shock loading in his rebuttal report is precluded by Rule 26.

Marksthaler also opines that "the required spacer washers were not installed" in the door. Second Marksthaler Decl. Ex. 3 at 1 (doc. 59). In his rebuttal report Marksthaler relies on manufacturer specifications for the number and placement of spacer washers from 2017 although the door at issue here was manufactured in 2013. *Id*. at 20. Marksthaler does not address in his rebuttal report whether the spacer washer specifications from 2017 were the same as those for doors manufactured in 2013.

The Court concludes on this record that plaintiff has not established by a preponderance of the evidence that Marksthaler's opinions are based on adequate facts or data or on a reliable methodology. Plaintiff also has not established that Marksthaler is qualified as an expert by his "knowledge, skills, experience, training, or education" or that his technical or other specialized knowledge will help the trier of fact. Accordingly, the Court grants defendants' Motion to Exclude Expert Opinions of Marksthaler.

## IV.    Motion to Strike Marksthaler's Declaration

In their Reply defendants move to strike Marksthaler's Declaration filed in support of plaintiff's Response to defendants' Motion to Exclude on the grounds that most of it is contradicted by his deposition testimony, contains hearsay, and is not supported by the evidence.[2]

The Court denies defendants' Motion to Strike to the extent that it declines to strike Marksthaler's entire Declaration. The Court grants defendants' Motion to Strike to the extent that it will disregard the portions of the Declaration that are contradicted by Marksthaler's deposition testimony, are not supported by the evidence, and/or do not contain admissible evidence. **[Judge,**

---

[2] This motion to strike is in violation of Local Rule 7-1(b), which provides in relevant part: "Motions may not be combined with any response, reply, or other pleading." In the interest of conserving judicial resources and addressing all evidentiary objections to plaintiff's exhibits, the Court will address defendants' motion.

**V.      Motion to Exclude Expert Opinions of Michael Freeman, Ph.D.**

Defendants move to exclude the expert opinions of Michael Freeman pursuant to Federal Rules of Evidence 701 and 702 and *Daubert* on the grounds that Freeman lacks the requisite qualifications, expertise, or experience to rebut the opinions and conclusions of defense expert Kevin Adanty and Freeman's opinions fail to meet the standards for admissibility under Rule 702 and *Daubert.* Defendants also move to strike Freeman's Declaration on the basis that it is contradicted by this deposition testimony, reports, and curriculum vitae.[3]

**A.      Freeman's Qualifications**

Defendants assert Freeman does not have the qualifications, expertise, or experience to rebut the biomechanical opinions of defense expert Kevin Adanty, Ph.D. Freeman acknowledged at deposition that he is an epidemiologist "with a focus on traffic crash related injuries," not an engineer or a biomechanical engineer and he does not have a degree in engineering, biomechanical engineering, biomechanics, kinematics, or kinetics. Fifth Barton Decl. Ex. 1 at 24, 34-35 (doc. 56). Freeman noted that during his Master of Science in Forensic Medical Sciences program he did not have any coursework in engineering and although biomechanics "was incorporated into some of the stuff they talked about crashes . . . it was very elementary, it was really . . . not informative." *Id.* at 26-27. Freeman testified at deposition that he did a "reconstruction of the injury event . . . applying biomechanical principles, but [he] didn't do a crash reconstruction because it wasn't a traffic crash." *Id.* at 25.

Plaintiff cites several cases in which courts have admitted Freeman as an expert, but these cases involved traffic accident reconstructions, a topic in which Freeman is well-versed.

---

[3] This motion to strike is in violation of Local Rule 7-1(b). In the interest of conserving judicial resources and addressing all evidentiary objections, the Court will address defendants' motion.

B.      Reliable Principles and Methods

On September 9, 2024, Adanty completed a report in which he opined that plaintiff's injuries are not consistent with him falling directly on to his elbows and that if the strap broke as plaintiff reported, "he would not have fallen in a movement pattern that would result in his body landing on the left side of the ramp." Fifth Barton Decl. Ex. 9 at 3 (doc. 56). To support his opinion that plaintiff would have fallen on the right side of the ramp Adanty noted: (1) the trailer door strap was located to the right of the ramp, which would have required plaintiff to position his feet closer to the right side of the trailer door and ramp; (2) plaintiff testified at deposition that he initially pulled the strap with his right hand, but "it . . . took too much force for one hand" so he "assisted it with [his] left hand," which Adanty opines "result[ed] in his body twisting to the right," Fourth Oh-Keith Decl. Ex. 1 at 188 (doc. 64); (3) based on this body position "and the downward pulling force applied with both hands, [plaintiff's] body weight and center of gravity would have been oriented to his right"; (4) as a result, if the strap broke as plaintiff reported, "his upper body would lose support, and the momentum from pulling would likely cause him to fall toward the right side of the ramp." Fourth Barton Decl. Ex. 9 at 5 (doc. 51). Adanty also noted that plaintiff's daughter-in-law, Rosalie Barley, initially testified at deposition that she saw plaintiff on the ground on the right side of the ramp. *Id.* At deposition Adanty set out the basis for his conclusion:

> [Plaintiff's] center of gravity is shifted to the right of [him] because we have his right arm mass positioned on the right, we have his left hand that moved to -- left hand side of his body also to the right, so that adds more distance away to the right side of his body, and also he has pulling motion downwards that's occurring on the right side of his body.
>
> So his center of gravity overall has shifted from normally from the center and now it's moved to the right. . . . It's testimony from [plaintiff] and the principles of center of gravity being shifted. It's supported by simple biomechanics and physics principles.

*Id.* Ex. 7 at 67-68.

Page 16 – OPINION AND ORDER

In his rebuttal report Freeman states that "[a]bsent video footage of the fall, there is no way to determine the dynamics of the fall, beyond the basic description" provided by plaintiff at deposition where he states he fell backwards. *Id*. Ex. 2 at 10. Freeman notes that plaintiff "fell as he was exerting force on the strap, which suddenly gave way" and caused him to fall backwards. *Id.* Freeman asserts that "none of Dr. Adanty's opinions are based on the valid application of biomechanical theories." *Id*. Ex. 2 at 11. Freeman supports this assertion by noting that "[i]t is a matter of common experience that if one is pulling on an object that suddenly gives way that the muscular exertion moves the body in the direction opposite of the object, not towards it." *Id*. Freeman did not directly address Adanty's discussion of plaintiff's shifted body mass and center of gravity. At deposition Freeman testified that he "reconstructs an event" such as this one based on "certain things we know must be true. We know there's gravity, we know what the configuration . . . of the environment is that [plaintiff] fell in, we know what his physical injuries are, we know where he was described as being found." Fourth Oh-Keith Decl. Ex. 7 at 84 (doc. 64). Freeman went on to state, however, that "exactly how [plaintiff] got there and exactly what muscles he was exerting on to pull in what direction on a door and how that must have projected him one way or another, that's speculation." *Id*. When asked what biomechanical principles supported Freeman's view that plaintiff fell backwards off the ramp, Freeman responded that "it's [plaintiff's] recollection. I don't have a video to say what he says isn't true." Fifth Barton Decl. Ex. 1 at 115 (doc. 56). Freeman stated "[t]here is no reproducible biomechanical analysis that leads to [Adanty's] conclusion that this fall did not occur exactly how [plaintiff] said." Fourth Oh-Keith Decl. Ex. 7 at 115 (doc. 64). Defense counsel asked Freeman "for what biomechanical science . . . . supports your position that [plaintiff's] testimony is . . . accurate, what science is there to support your assertion?" *Id*. Freeman explained that when "you have somebody puling from right to left

Page 17 – OPINION AND ORDER

and up to down, if . . . the thing that they're pulling on suddenly releases, they will continue pulling for a very brief second, which is going to project them backwards and to the left, not to the right." *Id*. at 117. "It's a basic biomechanical concept" that "a sudden and unexpected change in resistance will cause a body to move." *Id*. Freeman testified that he relied on the biomechanical principle that "when there is tension applied to an object and that tension [is] suddenly released, then the tension will continue to pull the source of the tension in the same direction it was moving. So release and it will continue to move on that direction." *Id*. at 149-50. Freeman states it's "common sense" that in this case plaintiff would have fallen backwards pursuant to the biomechanical principal cited and Adanty's opinion is contrary to common sense. *Id.* at 150, 163. When asked what scientific principle he based his opinion on Freeman responded: "The scientific principle that [plaintiff] looked at something and said that makes sense to me." Barton Reply Decl. Ex 5 at 104 (doc. 69).

The Court concludes that plaintiff has not established by a preponderance of the evidence that Freeman is qualified to offer a rebuttal opinion on the biomechanical aspects of the incident at issue or that Freeman applied reliable principles and methods under Rule 702 or *Daubert*. The Court, therefore, grants defendants' Motion to Exclude Freeman's expert opinions.

### C.    Freeman's Declaration

Defendants also move to strike Freeman's Declaration on the basis that it is contradicted by this deposition testimony, reports, and curriculum vitae. The Court grants defendants' Motion to Strike to the extent that it will disregard the portions of Freeman's Declaration that are contradicted by his deposition testimony, are not supported by the evidence, and/or do not contain admissible evidence.

D.      **Exhibit 13**

In their Reply defendants also move to strike exhibit 13 to the Fourth Oh-Keith Declaration, references to that exhibit in Oh-Keith's Declaration, and plaintiff's references to that exhibit in his statement of facts on the grounds that it contains "unsupported and unauthenticated assertions that the trailer strap was attached 26 inches to the right of center." Oh-Keith states in his Declaration that exhibit 13 is "set of photographs taken at the April 8, 2024 inspection of the incident trailer. They show that the center of the ramp is at 48 inches from the right, and the opening for the strap is at 74 inches, some 26 inches further to the right." Fourth Oh-Keith Decl. ¶ 15 (doc. 64).

Defendants note that none of the photographs show that the strap was located 26 inches from the center of the trailer, the only photographs which depict a tape measure show it positioned along bottom of the trailer deck, none of the photographs depict the location of the trailer strap being measured, none of the photographs reflecting the tape measure include the strap, and the two photographs that include the strap do not include any measurements. In addition, neither Marksthaler nor Freeman testified to any specific measurement they conducted as to the location of the trailer strap. The Court concludes that exhibit 13 does not establish the proposition for which it is cited: the specific distance between the center of the ramp and the strap. The Court, therefore, grants defendants' motion to strike to the extent that the Court will disregard the portions of plaintiff's materials that rely on exhibit 13 to establish that the strap was located 26 inches from the center of the trailer.

**DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

I.      **Standard**

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, affidavits, and admissions on file, if any, show "that there is no genuine dispute as to any material

Page 19 – OPINION AND ORDER

fact and the [moving party] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Substantive law on an issue determines the materiality of a fact. *T.W. Elec. Servs., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). Whether the evidence is such that a reasonable jury could return a verdict for the nonmoving party determines the authenticity of the dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The moving party has the burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. *Id.* at 324.

Special rules of construction apply when evaluating a summary judgment motion: (1) all reasonable doubts as to the existence of genuine issues of material fact should be resolved against the moving party; and (2) all inferences to be drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party. *T.W. Elec.*, 809 F.2d at 630.

## II.    Evidentiary Issues

### A.    Defendants' Motions to Strike

Defendants include several motions to strike[4] in their joint Reply including requests to strike various statements and arguments in plaintiff's Response, Marksthaler's rebuttal report, and portions of plaintiff's Declaration. The Court has already addressed Marksthaler's rebuttal report. The Court grants defendants' other motions to strike to the extent that the Court will disregard evidence that is unsupported by the record, contrary to deposition testimony, or inadmissible.

---

[4] These motions to strike are in violation of Local Rule 7-1(b).

Page 20 – OPINION AND ORDER

### III.    Merits

Defendants assert they are entitled to summary judgment because (1) plaintiff's contract with ArcBest included "no warranty" and assumption of risk provisions; (2) the trailer was not provided to plaintiff in defective condition; (3) defendants were not involved in the design or manufacture of the trailer, trailer door, or strap; (4) there is no evidence that there was a lack of adequate warnings; and (5) ArcBest is not vicariously liable for any negligence.

### A.    No Warranty and Assumption of Risk Provisions

The bill of lading that was created when plaintiff entered into the agreement with ArcBest contains assumption of risk and no warranty provisions that defendants assert bar plaintiff's claims against them. It also provides "[s]ervices provided hereunder are governed by U.S. federal laws and regulations. . . . No state laws shall apply." First Barton Decl. Ex. 2 at ¶ 16 (doc. 41).[5] Plaintiff asserts the contract is governed by Oregon law and under Oregon law the assumption of risk and no warranty clauses are insufficient to overcome the presumption against the waiver of tort liability.

### 1.    Choice of Law

The bill of lading states "[s]ervices provided hereunder are governed by U.S. federal laws and regulations. . . . No state laws shall apply." Plaintiff asserts that this statement refers to the Carmack Amendment, 49 U.S.C. § 14706, which preempts certain state law negligence claims. Plaintiff asserts that notwithstanding that provision of the agreement, Oregon law applies.

---

[5] This paragraph also provides: "Any necessary judicial proceedings must be brought in a court of competent jurisdiction located in Sebastian County State of Arkansas." Neither defendant asserted improper venue in their Answer or asserts it as a basis to dismiss this action, and as such that issue is waived. Fed. R. Civ. P. 12(b).

In their motions for summary judgment defendants analyze the no-warranty provision under Oregon law.[6] Nevertheless, in their joint Reply defendants assert that because plaintiff "contracted for an interstate shipment with a bill of lading, [this provision] is governed by federal law." Defs.' Reply at 17 (doc. 49). Defendants, however, do not cite any federal law in their analysis of plaintiff's claims.

Plaintiff asserts the Carmack Amendment does not apply because it applies only to claims for "actual loss or injury to the property caused by" the carrier, 49 U.S.C. § 14706(a)(1), but plaintiff brings claims for bodily injury not for loss or injury to property. Defendants assert plaintiff is claiming negligent performance of an interstate contract of carriage and, therefore, the Carmack Amendment applies. The Supreme Court rejected a similar argument in *Chicago, R.I. & P. Ry. Co. v. Maucher*, 248 U.S. 359 (1919). In that case Barnum & Bailey entered into a contract with the Chicago, Rock Island & Pacific Railway Company in which the railway gave the right to use its tracks and locomotives to Barnum & Bailey. Barnum & Bailey agreed, among other things, that the railway would "not be liable for any injury, though arising from negligence, either to their own person or property, or to that of any other of their" employees. *Id*. at 362-63. During transport Maucher, an employee of Barnum & Bailey, was injured in a crash. Although Maucher had "agreed to release all railroad companies from any claim for injuries suffered while traveling with the circus on their lines, he brought an action in state court against the railway "for damages, alleging that he had been injured by its negligence." *Id*. The railway asserted that its contract with Barnum & Bailey released "it from all liability; that, since the contract related to a movement in interstate commerce, its validity was to be determined by the federal law; and that by the federal law the

---

[6] Defendants do not cite or refer to the Carmack Amendment in their initial motions for summary judgment.

Page 22 – OPINION AND ORDER

contracts were valid." *Id.* The trial court held that liability was to be determined by state law. Before the Supreme Court the railway asserted that before the Carmack Amendment established the "rights of carriers to limit by contract their liability for injuries occurring in interstate transportation," states "were free to establish their own laws and policies and apply them to such contracts," but "this power of the states was superseded by the Carmack Amendment" and, therefore, "the rights of plaintiff[s] in respect to personal injuries [were now] governed by the federal law." *Id.* The Supreme Court disagreed with the railway and affirmed the trial court stating "the Carmack Amendment deals only with the shipment of property. . . . [Plaintiff's] claim rests not upon a contract of carriage, but upon the general right of a human being not to be injured by the negligence of another." *Id.* at 363. *See also Fergin v. Westrock Co.*, No. 18-3502, 2020 WL 1778817 (8th Cir. Apr. 9, 2020) ("To date, the [Supreme] Court has not held that the Carmack Amendment preempts a state-law personal injury."); *McGinn v. JB Hunt Transp., Inc.*, No. 10-CV-610-JPS, 2012 WL 124401, at *3 (E.D. Wis. Jan. 17, 2012) (finding the plaintiffs' claims were not preempted by the Carmack Amendment because "they allege a separate, independently actionable harm from the loss of or damage to the goods. . . . [T]he harm is infliction of bodily injury, not property loss or damage. . . . [T]he plaintiffs' potential measure of damages is not at all correlative to the loss or damage to the goods. Indeed, it is not even clear that the goods involved in the accident were . . . damaged. . . . [The plaintiff] is seeking a remedy for bodily injuries sustained due to NYK's negligent loading of the goods and JB Hunt's failure to maintain and inspect the trailer on which the goods were transported."). Similarly here plaintiff's claims rest on his right not to be injured by the alleged negligence of defendants. The Court, therefore, concludes that the Carmack Amendment does not apply.

Plaintiff asserts that notwithstanding the provision in the bill of lading that "[n]o state laws shall apply," the Court should apply Oregon law to interpret the agreement pursuant to under § 15.320(4), which provides

the law of Oregon applies to . . . (4)(a) A consumer contract, if:

(A)    The consumer is a resident of Oregon at the time of contracting; and

(B)    The consumer's assent to the contract is obtained in Oregon, or the consumer is induced to enter into the contract in substantial measure by an invitation or advertisement in Oregon.

Plaintiff asserts in his Response that he "resided in Milwaukie, Oregon, when he made the Reservation." Pl.'s Resp. at 17 (doc. 44). Defendants note in their Reply, however, that there is no evidence on the record that plaintiff's assent to the contract was obtained in Oregon. Defendants point out that at the time he entered into the contract, plaintiff had purchased a home in Kentucky and had interviewed and been hired for a job in Kentucky. In his Declaration plaintiff testifies in pertinent part: "In January 2021, I made arrangements to move my household from Oregon to Kentucky by contacting a company called U-Pack to reserve a 29' trailer." First Barley Decl. at ¶ 3 (doc 47). Barley does not state in his Declaration and did not testify at deposition that he was in Oregon when he entered into the agreement. The Court finds plaintiff has not established that § 15.320(4) applies.

Plaintiff also asserts Or. Rev. Stat. § 15.355(1)(c) applies. That provision states "[t]he law chosen by the parties . . . does not apply to the extent that its application would . . . [c]ontravene an established fundamental policy embodied in the law" and that "reflects objectives or gives effect to essential public or societal institutions beyond the allocation of rights and obligations of parties to a contract at issue." Defendants do not respond to this argument.

Page 24 – OPINION AND ORDER

Oregon has a strong "rule . . . that a presumption will be indulged against an intention to contract for immunity from the consequence of one's own negligence," *Waterway Terminals Co. v. P. S. Lord Mech. Contractors*, 242 Or. 1, 19, 406 P.2d 556 (1965) (citations omitted), because "liability on such indemnity is so hazardous, and the character of the indemnity so unusual and extraordinary, that there can be no presumption that the indemnitor intended to assume the responsibility unless the contract puts it beyond doubt by express stipulation." *S. Pac. Co. v. Layman*, 173 Or. 275, 279, 145 P.2d 295 (1944). The Court concludes that application of the Carmack Amendment or other unspecified federal law would contravene an established fundamental policy embodied in Oregon law particularly since "claims for personal injury . . . have been found [to be] outside the broad purview of Carmack Amendment." *Gardner v. Ace Moving & Storage, LLC*, 741 F. Supp. 3d 1097, 1103 (W.D. Okla. 2024); *N. Am. Van lines, Inc. v. Pinkerton Sec. Sys., Inc.*, 89 F.3d 452, 458 (7th Cir. 1996) (noting tort remedies may be available for "separate and independently actionable harm . . . distinct from the loss of, or damage to, the goods."). Accordingly, the Court will apply Oregon law to determine whether the no warrant or assumption of risk provisions limit or abrogate defendants' liability for plaintiff's claims.

### 2. Application of Oregon Law

Defendants assert the assumption of risk and no warranty provisions in the bill of lading bar plaintiff's claims against them. The no warranty provision states:

> NO WARRANTY: ARCBEST, CARRIERS, AND THEIR AFFILIATES DO NOT MAKE, HAVE NOT MADE, NOR SHALL BE DEEMED TO MAKE OR HAVE MADE, ANY WARRANTY OR EPRESENTATION, EITHER EXPRESS OR IMPLIED, WRITTEN OR ORAL, WITH RESPECT TO THE EQUIPMENT OR SERVICES PROVIDED HEREUNDER OR ANY COMPONENT THEREOF, INCLUDING WITHOUT LIMITATION, ANY WARRANTY TO DESIGN, COMPLIANCE WITH SPECIFICATIONS, QUALITY OF MATERIALS OR WORKMANSHIP, <u>MERCHANTABILITY, FITNESS FOR ANY PURPOSE, USE, OPERATION OR SAFETY</u>. ALL RISKS ARE TO BE

Page 25 – OPINION AND ORDER

> BORNE BY CUSTOMER. WITHOUT LIMITING THE FOREGOING, ARCBEST, CARRIERS, AND THEIR AFFILIATES SHALL HAVE NO RESPONSIBILITY OR LIABILITY TO CUSTOMER OR ANY OTHER PERSON WITH RESPECT TO THE FOLLOWING, REGARDLESS OF ANY ACT OR OMISSION OF ARCBEST, CARRIERS, OR THEIR AFFILIATES: (I) ANY LIABILITY, LOSS OR DAMAGE CAUSED OR ALLEGED TO BE CAUSED DIRECTLY OR INDIRECTLY BY ANY EQUIPMENT OR SERVICES, ANY INADEQUACY THEREOF, ANY DEFICIENCY OR DEFECT (LATENT OR OTHERWISE) THEREIN, OR ANY OTHER CIRCUMSTANCE IN CONNECTION THEREWITH; OR (II) THE USE, OPERATION OR PERFORMANCE OF ANY EQUIPMENT, INCLUDING THE RAMP, OR ANY RISKS RELATING THERETO.

First Barton Decl. Ex. 2 at ¶ 15 (doc. 41). The assumption of risk provision states:

> ASSUMPTION OF RISK: Customer assumes all risks, liabilities and damages arising from the use and operation of all equipment, including trailers and ramps, . . . and further understands that such equipment can cause injury or death to Customer or others and or to property. Customer assumes full responsibility for and agrees to indemnify, defend and hold harmless ArcBest, carriers and their affiliates from any and all liabilities, damages, losses, expenses, including attorney's fees and litigation costs, in connection with the use or operation of such equipment by Customer [.]

*Id.* ¶ 14. Plaintiff asserts this language is insufficient to overcome the presumption against the waiver of tort liability in Oregon.

"Oregon law recognizes a policy favoring the freedom to contract as one pleases . . . unless there is some contravening policy which outweighs it." *Certain Underwriters at Lloyd's London v. TNA NA Mfg., Inc.*, 372 Or. 64, 71, 545 P.3d 736 (2024) (quotation omitted) (ellipses in original). "Accordingly, absent a public policy impediment, so long as the parties have expressed their intent with reasonable clarity, contractual immunity from a party's own negligence can be a matter for negotiation." *Id.* at 72 (quotation omitted). "'[P]ublic policy favors the deterrence of negligent conduct,'" therefore, "the allocation of liability in tort is one area where public policy may outweigh the general freedom to contract." *Id.* (quoting *Bagley v. Mt. Bachelor, Inc.*, 356 Or. 543, 572, 356 Or. 543 (2014)). As a result, "the established rule in Oregon" is that "a presumption will

Page 26 – OPINION AND ORDER

be indulged *against* an intention to contract for immunity from the consequence of one's own negligence and that a contract will not be given that meaning unless so expressed in unequivocal language." *Id.* (citations omitted) (emphasis in original). "[W]aiver will not simply be deduced from inference or implication. The text of the contract must show, clearly and unambiguously, that the parties intended to disclaim actions outside of contract, *i.e.*, actions in tort. Generic text that purports to waive *all* liability, or *any* loss, will typically be insufficiently specific to overcome the presumption against the waiver of tort liability." *Id.* at 67 (emphasis in original). "[E]xculpatory contracts are strictly construed to ensure that the releasing party did, in fact, knowingly bargain for the release of tort liability." *Id.* at 72 (quotations omitted). It is a "'heavy burden' to satisfy the 'clear and unequivocal' standard," therefore, "the exculpatory contract must put[ ] it beyond doubt, and the contract must make it crystal clear that the releasing party has absolved the other party from the consequences of the party's own negligence and product defects." *Id.* at 73 (quotation omitted).

"In considering whether a contract 'clearly and unequivocally' waives tort liability, Oregon courts consider both the language of the contract and the possibility of a harsh or inequitable result that would fall on [the releasing] party by immunizing the other party from the consequences of [its] own negligence." *Id.* at 73 (quotation omitted). In *Lloyd's London* SunOpta purchased food processing equipment from Food Design. After a listeria outbreak that resulted in a recall, SunOpta's insurer, Lloyd's London, brought claims for negligence and product liability against Food Design and TNA NA Manufacturing, Food Design's successor in interest. On summary judgment, the trial court held that SunOpta had waived any action in tort due to several provisions in its purchase contract with Food Design. The Oregon Court of Appeals affirmed but found that only section 11 of the contract, when viewed in the context of the contract

Page 27 – OPINION AND ORDER

as a whole, constituted a waiver of tort liability because that provision implicated "liability beyond that arising under the contract." *Id*. at 66. The Oregon Supreme Court reversed the Court of Appeal's decision on that issue. Section 11 provided:

> DISCLAIMERS:
>
> There are no warranties, express or implied, including the warranty of merchantability and the warranty of fitness for a particular purpose extending beyond those set forth in [s]ection 5. Seller's liability shall be limited to the repair or replacement of any defective equipment and the parties agree that this shall be Purchaser's sole and exclusive remedy. Seller shall not be liable, in any event, for loss of profits, incidental or consequential damages or failure of the equipment to comply with any federal, state or local laws. Seller shall under no circumstances be liable for the cost of labor, raw materials used or lost in testing or experimental or production operations of any equipment sold, whether such testing, production or experimentation is done under the supervision of a representative of the Seller or of any employee or other representative of the Purchaser.

*Id*. at 74. The Court of Appeals "did not identify any specific language of tort disclaimer in section 11 but reasoned that the inclusion of the wording 'in any event,' in [this] section [which was] separate from the one titled '[WARRANTIES]' and with broad language as to the types of damages disclaimed was sufficient." *Id*. at 75. The Oregon Supreme Court concluded that in so doing the Court of Appeals had "found the intent to waive tort liability through inference or implication, and through the use of broad language" *Id*. The Oregon Supreme Court "disagree[d] with both of those approaches." *Id*. The Court explained:

> The requirements of the UCC provide a reason for commercial contracts for the sale of goods to have separate headings in contracts for . . . warranty disclaimers. The UCC requires that disclaimers of implied warranties of merchantability or fitness be "conspicuous." Under the UCC, a "printed heading in capitals" is conspicuous, ORS 71.2010(10), and Oregon courts have previously held that warranty disclaimers are not sufficiently conspicuous if placed under a heading titled "warranty."

Page 28 – OPINION AND ORDER

*Id.* at 75-76 (citation omitted). Thus, placement of the disclaimer and its language did not provide sufficient clarity that it was tort liability that was being waived rather than simply certain warranties. *Id.* Similarly the paragraph at issue here complies with the UCC requirement to have a separate heading for warranty disclaimers and to be sufficiently conspicuous to disclaim those warranties. As a result, plaintiff reasonably might have interpreted this provision to waive only liabilities arising from breach of certain contract warranties, not to waive tort liability.

Paragraph 14 on assumption of risk is a closer question. Although the Court in *Lloyd's London* noted, "[g]eneric text that purports to waive *all* liability, or *any* loss, will typically be insufficiently specific to overcome the presumption against the waiver of tort liability," *id.* at 67, the cases the Court cited in support of that statement contained no limitations on the source of liability or loss. For example, in *Layman*, the contract provided that the licensee agreed to indemnify the licensor from "any and all loss, damage, injury, cost and expense of every kind and nature, from any cause whatsoever." 173 Or. at 276-77. Here, however, the assumption of risk is limited to "all risks, liabilities and damages arising from the use and operation of all equipment, including trailers and ramps" and that the customer "understands that such equipment can cause injury or death to Customer . . . and or to property." First Barton Decl. Ex. 2 at 5 (doc. 41). In *Steele v. Mt. Hood Meadows Oregon, Limited,* however, the Oregon Court of Appeals found that similar language was insufficiently specific and unequivocal to overcome the presumption against the waiver of tort liability in the context of the rest of the release language and the parties' relationship. 159 Or. App. 272, 974 P.2d 794 (1999). In that case, William Jameson purchased a ski pass that stated:

Page 29 – OPINION AND ORDER

**Skiing Is a Hazardous Sport**

The purchaser or user of this ticket accepts and assumes the inherent risks of skiing including man-made objects, changing conditions, natural obstacles, weather, and other skiers. (ORS 30.970–30.990)

\* \* \*

**Contract of Release and
Indemnification Agreement**

In consider[ation f]or lift access, the holder of this lift ticket agrees to [re]lease and indemnify Mt. Hood Meadows from any claims for personal injury and loss of/or damage to property arising in connection with or resulting from the use of this ticket or the area facilities.

159 Or. App. at 274. While skiing, Jameson "suffered injuries that allegedly led to his death." *Id*. at 275. Jameson's sister brought a wrongful death action against the ski resort asserting its negligence had caused Jameson's death. The parties cross moved for summary judgment with the defendant asserting that the release on the back of the ski pass barred the plaintiff's wrongful death action and the plaintiff asserting that the release did not bar her negligence claim. The court noted that although the release provided that the "holder of this lift ticket agrees to release and indemnify Mt. Hood Meadows from any claims for personal injury . . . arising . . . from the use of this ticket," it did "not specify whether the phrase 'any claims for personal injury' include[d] claims for personal injury arising from [the defendant's] negligence or whether it is limited to claims for personal injuries arising from other causes." *Id*. at 277 (citing *Estey v. MacKenzie Eng'g Inc.*, 324 Or. 372, 378-79, 927 P.2d 86 (1996) (limitation on "liability" that did not refer to negligence was insufficient because it could reasonably be interpreted as only limiting company's liability for other kinds of wrongs); *Harmon v. Mt. Hood Meadows*, 146 Or. App. 215, 218 n.1, 932 P.2d 92 (1997)). The court stated that "a release need not always specifically refer to negligence to bar a negligence claim" and noted "it might be a close question whether the text of the release - standing

alone - would be sufficient to bar plaintiff's negligence claim here." *Id*. at 277-78. The court, however, found that the rest of the release and the parties' relationship rendered the specific release language insufficiently clear and unequivocal. Specifically, the court noted that the release set out various "risks of skiing" that included "man-made objects, changing conditions, natural obstacles, weather, and other skiers" and "[g]iven the . . . explicit focus on injuries resulting from the inherent risks of skiing, the ticket holder reasonably could have understood that the phrase 'any claims for personal injuries' referred to any claims for injuries arising from those risks, not from the ski operator's negligence." *Id*. at 278. In addition, large signs posted at the ticket area asked guests to "'report any injury to the ski area operator immediately' and provide that '[f]ailure to notify the ski area operator by certified mail within 180 days of discovery of the injury may bar a claim for injuries (ORS 30.980).' The last sentence implies that [the defendant's] guests retain some claims for their injuries, a proposition that is at odds with the notion that the release bars all claims for personal injuries whatever their cause." *Id*. at 279.

The assumption of risk provision here does not specify whether the phrases "all risks, liabilities and damages" and "all liabilities, damages, losses, expenses . . . in connection with the use or operation of such equipment by Customer or its agents or hired labor service providers" includes claims for personal injury arising from defendants' negligence or whether it is limited to claims for personal injuries arising from other causes. The fact that the enumerated list of "customer," "its agents," and "hired labor service providers" does not include defendants could cause plaintiff to reasonably understand that the "all liabilities" phrase referred to any claims for injuries arising from actions of those individuals, not from defendants' negligence. Indeed, the tenor of the assumption of risk paragraph overall suggests that it is intended to limit defendants' liability for actions of the customer or any "hired labor service" that the customer employs rather

Page 31 – OPINION AND ORDER

than to limit defendants' liability for its own negligence. This is reinforced by the paragraph

directly preceding the assumption of risk paragraph, which states in relevant part:

> INDEMNITY & LIMITATION ON DAMAGES: Customer agrees to indemnify, defend and hold harmless ArcBest, carriers and their affiliates, parent companies, officers, directors, and employees, from and against any and all demands, claims and causes of actions for liabilities, damages, losses, expenses, and fines, including, but not limited to, direct, indirect, incidental, consequential, special, punitive or multiplied damages, fines, penalties, attorney's fees and litigation costs incurred by ArcBest, carriers and their affiliates which arise out of or in connection with Customer's shipment(s) covered by this agreement *which are caused or alleged to be caused by Customer, its agents or contractors, including labor service providers* as to shipments covered by this Agreement.

First Barton Decl. Ex. 2 at ¶ 13 (doc. 41) (emphasis added). The assumption of risk paragraph in

combination with this paragraph could reasonably cause plaintiff to understand that he was not

waiving claims for injuries arising from defendants' negligence. The Court concludes the

assumption of risk and no warrant provisions in the bill of lading do not clearly and unequivocally

reflect the parties' intent to absolve defendants of the consequences of their own negligence.

Accordingly, the Court declines to grant defendants' Motions for Summary Judgment on the basis

of release.

### B.    Strict Products Liability Claim

Plaintiff brings a claim for strict products liability on the grounds that the trailer

"was in defective condition at the time it left the hands of . . . ArcBest and . . . Old Dominion" and

the defective condition was unreasonably dangerous to the ultimate user because of its design

and/or manufacture. *Id.* ¶ 20-22. Plaintiff also alleges the trailer was "in a defective condition that

was unreasonably dangerous . . . because of the lack of adequate warnings of the possible

consequences of use of the roll-up door and/or door strap." *Id.* ¶ 23.

Page 32 – OPINION AND ORDER

Defendants allege that ArcBest, as a freight forwarder, is not subject to strict liability under Oregon law and that plaintiff has not established that a genuine dispute of material fact exists as to plaintiff's strict liability claim.

### 1.    ArcBest

In Oregon, a product civil liability action may be "brought against a manufacturer, distributor, seller or lessor of a product for damages for personal injury, death or property damage arising out of: Any design, inspection, testing, manufacturing or other defect in a product." Or. Rev. Stat. § 30.900(1).

In the section of the agreement that plaintiff entered into with ArcBest titled "General Information and Instructions," ArcBest notes it is "a freight forwarder."[7] First Barton Decl. Ex. 2 at 1 (doc. 41). In the bill of lading terms, ArcBest states that it "assumes the liability of a freight forwarder." *Id*. at 3. ArcBest's company representative explained at deposition that freight forwarders do not load, drive, maintain, inspect, repair, or own trucks or trailers. *Id*. Ex. 3 at 23, 29-30. Freight forwarder[s] "[u]tilize[] transportation providers to actually perform the service" of getting goods "from point A to point B." *Id*. at 23. ArcBest customers contact it "asking questions, asking prices. And then [ArcBest] arrange[s] for the actual transportation carrier to show up for the customer to utilize. And then [the carrier] handle[s] the actual physical operations of it. . . . [ArcBest] facilitates that process." *Id.* at 24. Defendants assert that ArcBest is not a manufacturer, distributor, seller, or lessor of a product, rather it is a provider of services and, therefore, is not subject to a product liability action. Plaintiff cites Oregon cases in which courts held that lessors of equipment may be subject to strict products liability, but unlike the defendants in the cases cited by plaintiff, the record here reflects that ArcBest does not lease equipment.

---

[7] Plaintiff does not appear to dispute that ArcBest is a freight forwarder.

ArcBest instead provides the service of connecting individuals with other companies who provide space in and transportation of trailers. The cases relied on by plaintiff are, therefore, inapplicable.

The parties do not cite any cases addressing whether a freight forwarder that provides only the services provided by ArcBest can be subject to strict products liability and Oregon courts have not addressed the question. The Ninth Circuit also has not addressed this question in a published opinion, however in an unpublished opinion the Ninth Circuit held that freight forwarders were not product sellers or lessors under Idaho's product liability act because they "acted as typical freight forwarders and their role was merely to arrange for transportation of the product from the Chinese manufacturer-seller to the American buyer." *Delgadillo v. Unitrons Consol., Inc.*, 191 F. App'x 547, 551 (9th Cir. 2006). One other court reached a similar conclusion. *See, e.g., McDonald v. LG Electronics U.S.A., Inc.*, 219 F. Supp. 3d 533, 542 (D. Md. 2016) (the court dismissed claims against Amazon arising from a battery sold by a third party that allegedly caused personal injury on the basis that providing services that enabled third parties to accomplish a sale did not make Amazon a seller or merchant).

The Court concludes that because ArcBest provides only the service of connecting customers with carriers, it does not manufacture, distribute, sell, or lease a product under Oregon's product liability laws. The Court, therefore, concludes ArcBest is not subject to plaintiff's strict liability claim. Accordingly, the Court grants defendants' motions for summary judgment as to plaintiff's strict products liability claim against ArcBest.

### 2.    Plaintiff's Claim Based on the Strap Design/Manufacture

Plaintiff alleges the following design and/or manufacturing defect involving the strap: "The door strap attached to the roll-up door lacked the strength or integrity needed for plaintiffs ordinary and foreseeable use of the trailer." Compl. at ¶ 21 (doc. 1).

Under Or. Rev. Stat. § 30.920, liability attaches to a seller or lessor of a product "in a defective condition unreasonably dangerous to the user or consumer" when "[t]he seller or lessor is engaged in the business of selling or leasing such a product" and "[t]he product is expected to and does reach the user or consumer without substantial change in the condition in which it is sold or leased." Or. Rev. Stat. § 30.920(1)(a)-(b). Oregon courts "are to construe the elements of strict products liability 'in accordance with the Restatement (Second) of Torts [§] 402A, Comments a to m (1965).'" *Hobus v. Howmedica Osteonics Corp.*, 699 F. Supp. 3d 1122, 1147 (D. Or. 2023) (quoting Or. Rev. Stat. § 30.920(3)). "At a minimum to survive summary judgment plaintiff must demonstrate a genuine dispute as to a material fact on the following elements: (1) defect, (2) causation, and (3) damages." *Id.* at 1148. Defendants assert plaintiff has not established there is a genuine dispute of material fact as to whether the strap was defective within the meaning of § 30.920.

Oregon uses the "consumer expectations" test to determine whether a product is defective. *Chong v. STL Int'l, Inc.*, 152 F. Supp. 3d 1305, 1317 (D. Or. 2016) (citing *McCathern v. Toyota Motor Corp.*, 332 Or. 59, 75, 23 P.3d 320 (2001)). That test requires a plaintiff to "'prove that, when the product left the defendant's hands, the product was defective and dangerous to an extent beyond that which the ordinary consumer would have expected.'" *Id.* (quoting *McCathern,* 332 Or. at 79). "Whether a product is dangerous to an extent beyond that which would be contemplated by the ordinary consumer is a factual question to be determined by the jury." *Id.* (quoting *McCathern,* 332 Or. at 77). "A trial court must, however, 'ensure that the evidence is sufficient for the jury to make an informed decision about what ordinary consumers expect.'" *Id.* (quoting

*McCathern,* 332 Or. at 77). Or. Rev. Stat. § 30.910[8] "creates a rebuttable presumption that a product is not defective," therefore, "'a plaintiff may not rely on the bare assertion of a defect from which a jury may infer unreasonable dangerousness; rather, a party must affirmatively put forth some evidence on the issue of dangerousness before the issue may properly be submitted to a jury.'" *Id.* (quoting *Russell v. Deere & Co.,* 186 Or. App. 78, 83, 61 P.3d 955 (2003)).

"'In addition to presenting proof as to the condition of the defendant's product, the plaintiff in a strict liability case is required to establish that such condition proximately caused his injuries or damages.'" *Chong,* 152 F. Supp. 3d at 1317 (quoting *Gilmour v. Norris Paint & Varnish Co.,* 52 Or. App. 179, 184, 627 P.2d 1288 (1981), and citing *Edmons v. Home Depot, U.S.A.,* Inc., 2011 WL 127165, at *8 (D. Or. Jan. 14, 2011); *McCathern,* 332 Or. at 77 n.15). "'This requires that a plaintiff introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a substantial factor in the result. A mere possibility of such causation is not enough[.]'"*Id.* (quoting *Edmons,* 2011 WL 127165, at *8).

Defendants assert that plaintiff has not established there is a material dispute of fact as to whether the strap was defective and unreasonably dangerous when it left defendants' hands. Defendants note that plaintiff testified he had "dealt with trailers on dozens of occasions" and the strap on the trailer here appeared to be the same kind of strap he had "encountered on those occasions." First Barton Decl. Ex. 1 at 169 (doc. 41). Plaintiff's son testified that he had unloaded trucks previously and had done so using straps similar to the one at issue. *Id.* Ex. 4 at 21, 24-25. Plaintiff and his son testified that in the 12 days they used the trailer they did not notice anything unusual about the strap, did not notice any fraying or tearing on the strap, did not notice any

---

[8] Or. Rev. Stat. § 30.910 provides: "It is a disputable presumption in a products liability civil action that a product as manufactured and sold or leased is not unreasonably dangerous for its intended use."

Page 36 – OPINION AND ORDER

unusual wear or tear to the strap, and did not notice anything dangerous or "obvious[ly] wrong with the strap." *Id.* Ex. 1 at 168-69, 244; Ex. 4 at 27-28. Plaintiff also testified that he did not complain to anyone at ArcBest or Old Dominion about the condition of the strap. *Id.* Ex. 1 at 241. In addition, the driver who delivered the truck, Brad Ball, testified that drivers submitted pre-inspection reports only when they found problems with a trailer during the mandated pre-trip inspection. Barton Supp'l Decl. Ex. 17 at 34 (doc. 49). Although Ball did not specifically remember inspecting the trailer at issue, he conducts the same inspection with every delivery, the inspection includes a visual inspection of the strap, he would have noticed and reported anything more than a half-inch tear in the strap in a pre-inspection report, and he did not file a pre-inspection report. *Id.* at 38-39. Further, Old Dominion maintenance technician Trenton Hyatt testified at deposition that he performed the yearly maintenance inspection of the trailer on July 28, 2020, during which he inspected the strap visually and also grabbed the strap and pulled on it. Second Barton Decl. Ex. 6 at 22-23, 47 (doc. 42). Hyatt noted that the trailer passed inspection, therefore, the strap was not frayed or ripped at that time. *Id.* at 47. Finally, even if the Court had concluded Marksthaler was an acceptable expert witness, he conceded at deposition that he had no way "of knowing when th[e] [cuts and tears in the strap] might have occurred except that they were present when [he] examined [the strap] in August 2021," six months after the incident.[9] *Id.* Ex. 1 at 109. Similarly, although Marksthaler opines in his rebuttal report that "[i]mmediately before failure, only a small section of the strap width remained," Second Marksthaler Decl. Ex. 3 at 2 (doc. 59), at deposition he conceded that "he would have to think of a way" to scientifically determine when various sections of the strap failed, that his opinions were "intuitive," and he had "no science" to

---

[9] Rosalie Barley testified at deposition that she collected the strap at some point after the incident, put it in a bag, and gave it to plaintiff's counsel approximately a year after the incident. Barton Supp'l Decl. Ex. 25 at 12-13 (doc. 49).

Page 37 – OPINION AND ORDER

support this opinion. Fourth Barton Decl. Ex. 1 at 166 (doc. 51); First Barton Decl. Ex. 7 at 140 (doc. 41). On this record the Court concludes that plaintiff has not adduced sufficient evidence to overcome the rebuttable presumption that the strap as manufactured and sold or leased was unreasonably dangerous for its intended purpose when it left defendants' hands.

### 3.    The Door Design or Manufacture

Plaintiff alleges the following design and/or manufacturing defect involving the door: "The roll-up door, including the door strap, balancer assembly, rollers, and/or track required a downward force applied to the door strap to close the door which exceeded the tolerance of the door strap." Compl. at ¶ 22. Defendants assert that plaintiff has not established that there is a material dispute of fact as to whether the door was defective and unreasonably dangerous when it left defendants' hands.

To support his defect claim regarding the door, plaintiff relies on the expert reports of Marksthaler and Respass, both of which this Court has determined are inadmissible expert testimony. Plaintiff also relies on his deposition testimony and that of his son. Plaintiff testified "it was hard to close the upper part of [the trailer door] . . . it was just difficult to close the upper portion of it"; "it took a lot of . . . pressure to get it past . . . the first . . . quarter of closing." First Oh-Keith Decl. Ex. 1 at 165, 166 (doc. 45). Plaintiff's son testified that the door "was really hard to close" and "the whole time it was very hard to pull [the door] down." *Id.* Ex. 14 at 24. Defendants, on the other hand, point out that Ball testified at deposition that before he delivered the trailer he would have conducted an inspection that included rolling the door up and down. Ball, however, did not file a pre-inspection report noting any issues with the door, which he would have done had the door had issues. Nor did plaintiff report issues with the door to defendants. Finally, Ball testified that when he delivered the trailer, he would have shown plaintiff how to operate the

Page 38 – OPINION AND ORDER

door, including opening and closing it. Barton Supp'l Decl. Ex. 17 at 51-52 (doc. 49). To the extent that plaintiff attempts to assert that the rollers were inadequate or damaged, the Court has already concluded that Marksthaler's opinions are inadmissible, but even if admissible, they would not demonstrate that the rollers were either defective or inadequate when the trailer left defendants' hands. Marksthaler noted "rollers and axels were observed to be rusty and the tracks showed several areas of mechanical damage." Fourth Barton Decl. Ex. 2 at 10 (doc. 51). Marksthaler conceded at deposition, however, that his inspection occurred more than three years after the incident, during which time the trailer sat outside in the weather and was not maintained or serviced. Fourth Barton Decl. Ex 1 at 238, 255 (doc. 51). Marksthaler opined that the installation and maintenance document of door manufacturer, Transglobal Door, stated that "spacer washers were required to be installed at the second-from-the-top and second-from-the-bottom rollers," but "these spacer washers were not observed on the subject" door during the April 2024 inspection. Fourth Barton Decl., Ex. 2 at 10 (doc. 51). The documents on which Marksthaler relied for that opinion, however, were related to trailer doors manufactured in 2017 and the trailer at issue here was manufactured in 2013. Second Marksthaler Decl. Ex. 2 at 4 n.2, 6; Ex. 3 at 15 (doc. 59). In addition, Old Dominion's repair history for the trailer indicates that the door was inspected several times throughout 2020 and when issues were discovered, they were addressed and repaired. *See generally* Second Barton Decl. Ex. 9 (doc. 42). For example, on February 26, 2020, it was noted on inspection that the "roll up door both bottom rollers hinges bent and rollers missing" from normal wear. *Id*. at 8. Both bottom hinges were straightened and two new rollers were installed and the "[d]oor [then] worked as required." *Id.* On April 23, 2020, four door hinges were "[r]epair[ed] . . . as needed," one "door cable" was "[r]emove[d] and replace[d]," and "operator tension [was adjusted] as needed." *Id.* at 10. On July 6, 2020, the trailer manufacturer, Wabash

Page 39 – OPINION AND ORDER

National, completed work on a recall affecting the trailer frame assembly. *Id.* at 15. Plaintiff does not point to any evidence suggesting that defendants did not regularly inspect the trailer at issue or fail to repair issues that were discovered during inspection.

On this record the Court concludes that plaintiff has not presented sufficient evidence to rebut the presumption that the door as manufactured and sold or leased was not unreasonably dangerous for its intended purpose when it left defendants' hands.

### 4.    Inadequate Warnings

Plaintiff alleges defendants failed to provide adequate warnings of the door and/or strap's defective condition. Defendants assert the trailer was not in an unsafe condition, they did provide warnings, and those warnings were adequate.

Or. Rev. Stat. § 30.920(3) provides that Oregon's strict products liability statute shall be "construed in accordance with the Restatement (Second) of Torts sec. 402A, Comments a to m." Comment d provides that Oregon's products liability law applies "only where the product is . . . unreasonably dangerous" to the consumer. "The seller is not liable when he delivers the product in a safe condition, and subsequent mishandling or other causes make it harmful by the time it is consumed." *Id.* Comment h states that a "product is not in a defective condition when it is safe for normal handling and consumption." When, however, the seller "has reason to anticipate that danger may result from a particular use, . . . [the seller] may be required to give adequate warning of the danger . . . and a product sold without such warning is in a defective condition." *Id.*

A seller is required to give warning of a danger when the danger is "not generally known" and if the seller "has knowledge, or by the application of reasonable, developed human skill and foresight should have knowledge," of the presence of the danger. *Benjamin v. Wal-Mart Stores, Inc.*, 185 Or. App. 444, 455, 61 P.3d 257 (2003). Thus, "sellers of products have a duty to provide

adequate warnings about nonobvious risks of injury associated with the use of their products when they know, or reasonably should know, of those risks of injury." *Purdy v. Deere & Co.*, 311 Or. App. 244, 263, 492 P.3d 99 (2021) (citing *Benjamin,* 185 Or. App. at 454-55).

Defendants assert that plaintiff has not established the need for a warning in the first place because plaintiff has not established that the strap or trailer door were dangerous or defective when the trailer left defendants' hands. The Court has already concluded that plaintiff has not established that the strap or trailer door was dangerous or defective when it left defendants' hands. The Court, therefore, also concludes that plaintiff has not established defendants had a duty to warn of the "nonobvious risks of injury associated with the use of" the trailer strap or door because they have not established that defendants knew or reasonably should have known about the risk of injury.

Accordingly, the Court grants defendants' motions for summary judgment as to plaintiff's strict product liability claim.

### C.      Negligence Claim

Plaintiff brings a common law negligence claim against both defendants. Plaintiff asserts Old Dominion was negligent in one or more of the following ways:

> (a)      In failing to inspect the trailer, including the roll-up door, and the door strap;
>
> (b)      In failing maintain the trailer, including the roll-up door, and the door strap;
>
> (c)      In providing the trailer to Plaintiff that was in a dangerous condition;
>
> (d)      In failing to inform Plaintiff of the roll-up door's dangerous condition;
>
> (e)      In failing to inform Plaintiff of the door strap's dangerous condition.

Page 41 – OPINION AND ORDER

Compl. ¶ 15. Plaintiff alleges that Old Dominion was acting as ArcBest's actual or apparent agent and, therefore, ArcBest is vicariously liable for the damages caused by Old Dominion's negligence.

Defendants move for summary judgment on the grounds that plaintiff has not established that a genuine dispute of material fact exists as to whether Old Dominion failed to inspect or maintain the strap or door, whether Old Dominion provided the trailer to plaintiff in a dangerous condition, whether Old Dominion failed to inform plaintiff of the door or strap's dangerous condition, and whether ArcBest is vicariously liable.

To prove a negligence claim under Oregon law,

> "unless the parties invoke a status, a relationship, or a particular standard of conduct that creates, defines, or limits the defendant's duty, the issue of liability for harm actually resulting from defendant's conduct properly depends on whether that conduct unreasonably created a foreseeable risk to a protected interest of the kind of harm that befell the plaintiff."

*Tozer v. Katerra Constr. LLC*, 344 Or. App. 204, 210, 581 P.3d 530 (2025) (quoting *Fazzolari v. Portland Sch. Dist. No. 1J*, 303 Or. 1, 17, 734 P.2d 1326 (1987)). Plaintiff has not alleged a special status or relationship with defendants and theirs was an arm's-length, commercial relationship, which does not give rise to a special relationship under Oregon law. *Edmondson v. Thrifty Payless, Inc.*, No. 6:17-CV-1090-MC, 2018 WL 4495466, at *3 (D. Or. Sept. 19, 2018) ("an arm's length, vendor-buyer relationship is not a 'special relationship' for purposes of finding liability in negligence claims"). Plaintiff's claim is, therefore, premised on general principles of foreseeability. Accordingly, plaintiff must plead and prove:

> (1) the defendant's conduct caused a foreseeable risk of harm; (2) the risk is to an interest of a kind that the law protects against negligent invasion; (3) the defendant's conduct was unreasonable because of that risk; (4) the conduct was a cause of the plaintiff's harm; and (5) the plaintiff was within the class of persons and the plaintiff's injury was within the general type of potential incidents and injuries that made defendant's conduct negligent.

Page 42 – OPINION AND ORDER

*Jensen v. Costco Wholesale Corp.*, No. 6:22-CV-00479-AA, 2024 WL 3494982, at \*5 (D. Or. July 22, 2024) (citing *Son v. Ashland Cmty. Healthcare Servs.*, 239 Or. App. 495, 506, 244 P.3d 835 (2010)). *See also Chapman v. Mayfield*, 358 Or. 196, 205, 361 P.3d 566 (2015) ("[W]hen a claim for common-law negligence is premised on general principles of foreseeability, the plaintiff must plead and prove that the defendant's conduct created a foreseeable and unreasonable risk of legally cognizable harm to the plaintiff and that the conduct in fact caused that kind of harm to the plaintiff."). The Oregon Supreme Court has "repeatedly stated" its "preference for giving voice to the community's judgment through a jury determination prevails, except in extreme cases, where no reasonable person could find that the harm that befell the plaintiff was reasonably foreseeable." *Piazza v. Kellim*, 360 Or. 58, 80, 377 P.3d 492 (2016) (citing *Fazzolari*, 303 Or. at 17–18; *Stewart v. Jefferson Plywood Co.*, 255 Or. 603, 607, 469 P.2d 783 (1970)). Thus, "[a] defendant need not have been able to precisely forecast a specific harm to a particular person to be held liable" for negligence.

As to plaintiff's allegation in the complaint that defendants failed to inspect the trailer, the record reflects Old Dominion frequently inspected the trailer including the strap and door. In fact, the record contains 60 pages of information on repairs to the trailer, the vast majority of which arose from driver inspections finding issues that needed repair. First Oh-Keith Decl. Ex. 12 (doc. 45). In addition, Brad Ball testified that although he did not specifically remember inspecting the trailer before he brought it to plaintiff, he conducts the same inspection with every trailer before bringing it to a customer and the fact that he did not submit an inspection report suggests that the trailer did not have any obvious problems. The Court concludes that no reasonable juror could find Old Dominion failed to inspect the trailer. Accordingly, the Court grants defendants' motion for

summary judgment as to the portion of plaintiff's negligence claim alleging failure to inspect the trailer.

Plaintiff asserts that Old Dominion failed to maintain the trailer and that Old Dominion's repair records reflect the trailer door had a long history of chronic problems "followed by negligent and incorrect repairs." Pl. Resp. at 30 (doc 44). The evidence that plaintiff cites, however, does not support the allegation that the repairs were negligent or incorrect. The record reflects that Old Dominion regularly inspected the trailer including the door and strap and that when issues were discovered, repairs were made. *See generally* Second Barton Decl. Ex. 9 (doc. 42). Old Dominion director of maintenance, Nick Thompson, testified at deposition about the trailer repair records and explained that for each noted issue, repairs were made. *See generally* First Oh-Keith Decl. Ex. 5; Ex. 12 (doc. 45). When asked if this trailer was experiencing "more repairs or less than the average trailer in the Old Dominion fleet," Thompson stated that he did not have that information. *Id*. Ex. 5 at 77. Plaintiff does not point to any admissible evidence that the repairs made were incorrect or insufficient or that the trailer experienced more repairs than the average trailer. The Court, therefore, concludes plaintiff has not established a material dispute of fact exists as to the alleged failure to maintain the trailer. Accordingly, the Court grants defendants' motions for summary judgment as to the portion of plaintiff's negligence claim alleging defendants failed to maintain the trailer.

Plaintiff also asserts that the strap and door "were in incredibly poor condition when delivered." Pl. Resp. at 31. Plaintiff relies on his testimony at deposition, but as noted, plaintiff and his son testified that they did not notice anything wrong or dangerous with the strap during the 12 days that they used it to open and close the door. Plaintiff also relies on Marksthaler's testimony about the strap, but this Court has concluded he is not an acceptable expert witness. The Court,

Page 44 – OPINION AND ORDER

therefore, concludes plaintiff has not established that a material dispute of fact exists as to the state of the strap. Accordingly, the Court grants defendants' motions for summary judgment as to the portion of plaintiff's negligence claim related to the strap.

With respect to the door, however, plaintiff and his son testified that the door was difficult to close as to the first third of the pull down. On the other hand, Ball testified that before he delivered the trailer he would have conducted an inspection that included rolling the door up and down. Ball, however, did not file a pre-inspection report noting any issues with the door, which he would have done had the door had issues. Nor did plaintiff report issues with the door to defendants. Unlike the strict product liability context, no presumption exists in the common law negligence context that a product was not defective when it left defendants' hands. On this record, there is a dispute of fact as to the state of the door when it was delivered to plaintiff. The Court must, therefore, evaluate whether the harm experienced by plaintiff was reasonably foreseeable as a result of the condition of the door.

"The concept of foreseeability embodies a prospective judgment about a course of events; it 'therefore ordinarily depends on the facts of a concrete situation' and, if disputed, is a jury question." *Piazza,* 360 Or. at 69–70 (quoting citing *Fazzolari,* 303 Or. at 4); *see also Stewart,* 255 Or. at 607 ("The issue of the defendant's negligence . . . is frequently withdrawn from the jury and is resolved by the trial court . . . as a matter of law. The jury is given wide leeway in deciding whether the conduct in question falls above or below the standard of reasonable conduct deemed to have been set by the community. The court intervenes only when it can say that the actor's conduct clearly meets the standard or clearly falls below it."). "[T]he foreseeability test for negligence . . . states that one is negligent only if he, as an ordinary reasonable person, ought reasonably to foresee that he will expose another to an unreasonable risk of harm. *Stewart,* 255 Or.

Page 45 – OPINION AND ORDER

at 609. Although "foreseeability has reference to the 'generalized risk of the types of incidents and injuries that occurred[,] rather than the predictability of the actual sequence of events,'" *Piazza, 360 Or. at 82* (quoting *Fazzolari, 303 Or. at 13*), "as the term is usually understood, [it] is not associated with conduct which causes harm through the concatenation of highly unusual circumstances." *Stewart, 255 Or. at 609*.

In *Stewart* the Oregon Supreme Court "elaborated on the nature of a court's role in the foreseeability determination" *Piazza, 360 Or. at 74*. In that case, the plaintiff volunteered to assist in putting out a fire started by the defendant that had spread to an adjacent warehouse. While attempting to put out the fire from the roof of the warehouse, the plaintiff fell through a skylight that was covered by corrugated plastic and a film of dust making it indistinguishable from the rest of the roof. *Stewart, 255 Or. at 605-06*. The Court noted the "specific question" was "whether plaintiff's injury and the manner of its occurrence was so highly unusual that . . . as a matter of law . . . a reasonable man, making an inventory of the possibilities of harm which his conduct might produce, would not have reasonably expected the injury to occur." *Id.* at 609. "Stated in another way, the question is whether the circumstances are out of the range within which a jury could determine that the injury was reasonably foreseeable." *Id.* at 609-610. The Court concluded that foreseeability was a question for the jury explaining:

> A reasonable man could foresee that a fire started by him might spread to his neighbor's building and that in the effort to extinguish the fire his neighbor or a third person . . . might be injured as a result of a variety of possible circumstances - by being burned, by falling off a ladder, by falling off a roof, by falling through a burned portion of the roof, or by other similar risks normally associated with fighting fires.
>
> It is less likely that an injury would occur as a result of falling through a skylight and even less likely that one would fall through a skylight because it was covered in a manner that made it appear to be a solid part of the roof. But, although such conditions may not be a common cause of injury . . . it cannot be said that this setting for possible injury is so uncommon that a

Page 46 – OPINION AND ORDER

jury could not reasonably describe as foreseeable the risk of harm which it creates.

*Id.* at 610. The Court noted that it did not "have any statistics showing the frequency with which persons are injured as a result of falling through covered skylights," but "[w]e know . . . from our general knowledge of the way in which injuries occur, that a covered skylight might well expose a person on a roof to a risk of harm" and "it is not unlikely that the injury would occur in this manner in the course of fighting a fire." *Id.* at 611. The Court, therefore, concluded that the defendant's negligence was a question for the jury.

Here as in *Stewart,* the Court does not have any statistics showing the frequency with which persons are injured as a result of falling when trying to close the door on a trailer several feet above the ground, nor did the parties provide evidence that defendants knew of other times in which customers were injured trying to close trailer doors. The Court knows, however, from its general knowledge of the way in which injuries occur, that a trailer door that may be difficult to close might well expose a person attempting to close it while standing on a ramp several feet above the ground to injury and that such a series of events and injury is not so unlikely that the Court can say no reasonable juror could say it was foreseeable. The Court concludes that Old Dominion's negligence regarding provision of the trailer with the roll up door in the possible condition alleged by plaintiff is a question for the jury. Accordingly, the Court denies Old Dominion's motion for summary judgment as to the portions of plaintiff's negligence claim alleging Old Dominion provided the trailer to plaintiff with the dangerous condition of the roll-up door and failed to inform plaintiff of the door's allegedly dangerous condition.

## D.    Vicarious Liability

Plaintiff asserts ArcBest is vicariously liable for Old Dominion's negligence because "Old Dominion was acting as ArcBest's actual and/or apparent agent." Compl. ¶ 17. ArcBest asserts

Page 47 – OPINION AND ORDER

that even if the Court determines Old Dominion is liable, ArcBest is not vicariously liable because Old Dominion was an independent contractor.

"Generally, an agency relationship 'results from the manifestation of consent by one person to another that the other shall act on behalf [of] and subject to his control, and consent by the other so to act.'" *Towner v. Bernardo*, 304 Or. App. 397, 405-06, 467 P.3d 17 (2020) (quoting *Eads v. Borman*, 351 Or. 729, 735, 277 P.3d 503 (2012)). "An agency relationship can arise based on 'actual consent . . . or from the appearance of such consent.'" *Id.* (quoting *Eads,* 351 Or. at 736). The "principal is bound by or otherwise responsible for the actual or apparent agent's acts" when "the acts are within the scope of what the agent is actually or apparently authorized to do." *Id.* (quotation omitted). "Unless the evidence allows only one inference, whether a person is the actual or apparent agent of a putative principal is a question of fact for the jury." *Id.* at 406 (citing *Shepard v. Sisters of Providence*, 89 Or. App. 579, 585-89, 750 P.2d 500 (1988) (explaining the jury's role in determining issues of actual and apparent agency when the evidence supports competing inferences).

### 1.    Actual Agency

"For a party to establish actual agency, that party must show that the principal ha[s] a right to control the acts of its agent and both parties must also agree that the agent will act on the principal's behalf." *Towner,* 304 Or. App. at 406 (quotation omitted). When the agent's conduct causes physical injury, "[t]he right of control or apparent right of control must be over the agent's injury-causing actions." *Id.* (quotation omitted). Thus, "to impose vicarious liability for a nonemployee agent's physical conduct, the principal must have . . . a right to control how the act is performed - that is, the physical details of the manner of performance - that is characteristic of an employee-employer relationship." *Id.* (quotation omitted).

Plaintiff asserts that ArcBest's representative, Arden Jones, testified at deposition that ArcBest retained and exercised control over delivery of the trailers, facilitating transportation of the trailers to their destinations, and providing safety information and instructions regarding the trailers; retained and exercised "some control" over the maintenance of the trailers used by the carriers and monitored the carriers' safety; and also explained the use of the trailer to the consumer. First Oh-Keith Decl. Ex. 2 at 24-25, 28-29, 33, 41, 44-45, 59-60, 70 (doc. 45).

Defendants point out that contrary to plaintiff's summary of Jones's testimony, Jones in fact testified that ArcBest worked with independent contractor carriers to "arrange for [them] to show up" when a customer needed a trailer. *Id. at 24*. The carrier would then transport the trailer and leave it at the destination for the customer to unload. *Id.* at 25. Jones testified that ArcBest had "videos available" that provide "information on the safe operation of the . . . trailer." *Id.* at 28-29. Jones noted that the videos on the U-Pack website contained advice about leaving space to park the trailer, tips on operating the ramp safely, and how to load items properly, but he did not recall if the videos provided information on using the roll-up door. *Id.* at 29, 44-45. Jones testified that plaintiff was given, among other things, a diagram of a trailer, but it showed a swing out door instead of the roll-up door, a move checklist, and a "do not ship list," but there was nothing on any document that discussed safe use of the roll-up door. *Id*. 59-60, 61-62. The only involvement ArcBest had with maintenance of trailers was if a customer reported a problem with a trailer, ArcBest would inform "maintenance or the appropriate personnel" at the carrier and they were responsible for taking care of the issue. *Id*. at 34. ArcBest has no "mechanism [to] decide they . . . don't want this particular trailer in the future." *Id.* Jones testified that ArcBest monitors "the government safety ratings" for the transportation carriers they contract with "to make sure that they are satisfactory" and they "gather feedback from . . . customers in the form of customer

Page 49 – OPINION AND ORDER

surveys." *Id*. at 70. This evidence is insufficient to create a material issue of fact as to whether ArcBest had the right of control over the injury-causing action, *i.e.,* the state of the roll-up door, or to create a material dispute of fact as to ArcBest's right to control the physical details of the manner of Old Dominion's performance that is characteristic of an employee-employer relationship. The Court, therefore, concludes plaintiff has not established that a material dispute of fact exists that Old Dominion is ArcBest's actual agent.

### 2.    Apparent Agency

"Apparent authority is the power held by an agent 'to affect a principal's relations when a third party reasonably believes the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations.'" *Columbia Cascade Co. v. City of Fernandina Beach*, 286 Or. App. 729, 739, 400 P.3d 1001 (2017) (quoting *Harkness v. Platten*, 359 Or. 715, 723-24, 375 P.3d 521 (2016)). "'[A]pparent authority to do any particular act can be created only by some conduct of the principal which, when reasonably interpreted, causes a third party to believe that the principal consents to have the apparent agent act for him on that matter.'" *Towner*, 304 Or. App. at 409 (quoting *Eads*, 351 Or. at 736). In addition, the "third party must actually rely on the principal's representation of authority." *Lee v. Trees, Inc.*, No. 3:15-CV-0165-AC, 2017 WL 2642271, at *5 (D. Or. June 16, 2017) (citing *Harkness*, 359 Or. at 723). "Thus, there are two keys to the analysis: (1) the principal's representations; and (2) a third party's reasonable reliance on those representations." *Columbia Cascade*, 286 Or. App. at 739 (quotation omitted).

As to the first element, "the principal must take some affirmative step in creating the appearance of authority, one that the principal either intended to cause or should realize likely would cause a third party to believe that the putative agent has authority to act on the principal's

behalf." *Id*. (quotation omitted). "'[T]he representation of authority need only be *traceable* to the principal,'" and "'when a principal cloaks an agent with actual authority to perform certain tasks, that actual authority may create the appearance of authority to perform other, related tasks.'" *Id*. (quoting *Harkness,* 359 Or. at 722-23) (emphasis in *Harkness*). As to the second element "the third party must actually rely on the principal's representation when dealing with the agent and that reliance must be objectively reasonable." *Id.* (citation omitted).

Plaintiff testified at deposition that he understood the company "that was involved in this particular move" was U-Pack. First Barton Decl. Ex. 1 at 81 (doc. 41). Plaintiff states in his declaration that he "only spoke with U-Pack representatives regarding the reservation for the trailer," the reservation confirmation . . . only mentioned 'U-Pack,' [a]ll other documentation [he] received only mentioned 'U-Pack,'" and when the trailer was delivered he "believed and understood that U-Pack was responsible for delivering and transporting the trailer, and relied on that belief . . . in all of [his] dealings with U-Pack." Barton Suppl. Decl. Ex. 24 at ¶¶ 4-10 (doc 49).

Defendants note that the move confirmation plaintiff received from ArcBest specifically stated that plaintiff was the "customer"; ArcBest is a freight forwarder; and "carrier," in this case Old Dominion, "is an independent contractor who is not an agent or employee of ArcBest." First Barton Decl. Ex. 2 at 1, 8, 9 (doc. 41). The move confirmations, however, each had a large heading stating "U-Pack" and the telephone number provided is for ArcBest. Arden Jones testified at deposition that "customers will contact" ArcBest "asking questions, asking prices" and ArcBest arranges "for the actual transportation carrier to show up." First Barton Decl. Ex. 3 at 24 (doc. 41). When customers are finished loading their trailers "they contact [ArcBest] of the carrier and let [them] know its ready to be picked up." *Id*. ArcBest "answer[s] question about how the process

Page 51 – OPINION AND ORDER

works," "provide[s] a price quote," and takes a reservation. *Id*. at 26. Thus, ArcBest was engaged in conduct which might reasonably cause a customer to believe it was the agent of Old Dominion.

The Court concludes that the evidence of apparent agency here does not allow only one inference. Accordingly, whether ArcBest is an apparent agent and, therefore, vicariously liable for plaintiff's injury is a question of fact for the jury. Accordingly, the Court denies defendants' Motions for Summary Judgment as to the portion of plaintiff's negligence claim related to the state of roll-up door.

## CONCLUSION

For the reasons stated herein, defendants' Motion To Exclude Expert Opinions of Mark Respass (doc. 50) is granted, defendants' Motion To Exclude Expert Opinions of Jeffrey Marksthaler (doc. 51) is granted, and defendants' Motion To Exclude Expert Opinions of Michael Freeman, Ph.D. (doc. 55) is granted.

ArcBest's Motion for Summary Judgment (doc. 41) and Old Dominion's Motion for Summary Judgment (doc. 42) are granted in part and denied in part as follows:

1.    Granted as to plaintiff's strict liability claim;

2.    Denied as to plaintiff's negligence claim related to the condition of the door separate and apart from the strap; and

3.    Granted as to the remainder of plaintiff's negligence claim.

IT IS SO ORDERED.

DATED this 11th day of March, 2026.


_____/s/ Jolie A. Russo_____
Jolie A. Russo
United States Magistrate Judge


Page 52 – OPINION AND ORDER